IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JULIA HANKERSON | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| LEGACY TREATMENT SERVICES, | : | |
| INC. | : | NO. 19-18927-JRP-KMW |

## MEMORANDUM

**Padova, J.**                                                    **October 20, 2021**

Plaintiff Julia Hankerson filed this employment discrimination action against Defendant Legacy Treatment Services, Inc. ("Legacy") after she was terminated from her job as an outpatient therapist at Legacy.   Hankerson asserts claims of race and age discrimination based on failure to promote and unlawful termination pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., and New Jersey's Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 et seq. Legacy has filed a Motion for Summary Judgment, seeking judgment in its favor on all of Hankerson's claims.   For the following reasons, we grant the Motion and enter judgment in Legacy's favor.

## I.    BACKGROUND

The summary judgment record contains the following undisputed facts. Plaintiff Julia Hankerson is an African-American woman who is in her mid-sixties.   (Hankerson Certif. ("Pl. Cert."), Docket No. 29-26, ¶¶ 2-3.)   She is a Licensed Clinical Social Worker ("LCSW") and a Certified Clinical Supervisor.   (Concise Statement of Stipulated Material Facts ("Stip. Facts") ¶ 4; Pl. Cert. ¶¶ 4-5.)   She is not licensed as a Licensed Clinical Alcohol and Drug Counselor ("LCADC"), which allows the license holder to independently provide counseling for substance abuse concerns.   (Stip. Facts ¶ 5; Samantha Kunz Dep., Def. Ex. F, at 91.)   She is also not a

Certified Alcohol and Drug Counselor.   (Stip. Facts ¶ 5.)   Hankerson worked as an outpatient therapist for Legacy, in its Northfield location, from October 2018 until her termination on March 25, 2019.   (Stip. Facts ¶¶ 1-2; Oct. 19, 2018 Employment Letter, Pl. Ex. 1.)

Hankerson originally sent her resume to Legacy on September 25, 2018.   (Sept. 25, 2018 emails between Hankerson and Ronald Redmond, Def. Ex. B, at 3.)   In response, Ronald Redmond, Legacy's Division Director of Ambulatory and Emergency Services at the Northfield location, inquired whether Hankerson was seeking full- or part-time work.   (Id. at 2.)   Redmond advised Hankerson that Legacy could pay her $55,000.00 for a full-time position and could possibly pay her more if it "could steal some of her Clinical Supervision slots."[1]   (Id.)   Hankerson replied that she would be interested in working thirty hours per week and "definitely could do supervision."   (Id. at 1.)   Redmond told Hankerson that Legacy could use her to supervise three Licensed Social Workers ("LSWs") on site and stated that Legacy would like to bring her on full time if possible.   (Id.)

Redmond interviewed Hankerson on October 3, 2018.   (Pl. Interview Questionnaire, Def. Ex. C.)   During the interview, Hankerson repeated that she was looking for a position for just thirty hours per week and she reiterated that she was an LCSW, which enabled her to supervise others.   (Id. at 1.)   Legacy subsequently hired Hankerson, as a reduced full-time, at-will Outpatient Therapist with an annual salary of $55,000.00, and she began employment with Legacy on October 22, 2018 as a salaried Outpatient Therapist.   (Oct. 19, 2018 Employment Letter, Pl. Ex. 1.)   In that position, Hankerson had no clinical supervisory responsibilities.   (Pl. Cert. ¶ 7.)

In December of 2018, Legacy asked if Hankerson would provide clinical supervision to its

---

[1] The summary judgment record reflects that an LCSW is only permitted to supervise six LSWs at one time.   (Christine Kirkbride Dep., Def. Ex. D, at 119.)

three LSWs: Thomas Woodruff, Neiderling Henry, and Sheri Webster, and she agreed.   (Id. ¶¶

8-9; Stip. Facts ¶ 6.)   Without an LCSW supervisor, Woodruff, Henry, and Webster could not see

patients, because their work had to be supervised by someone with a clinical license.   (Stip. Facts

¶ 7; Hankerson Dep., Def. Ex. A, at 62.)   Hankerson's position at Legacy was officially changed,

effective December 30, 2018, to a full-time, at-will Outpatient Therapist, with a $63,000.00 annual

salary.   (Jan. 22, 2019 Change of Status Mem., Pl. Ex. 17; Stip. Facts ¶ 2.)

On January 16, 2019, Hankerson submitted her resume and a cover letter to apply for the

open position of Director of the Legacy's Northfield Outpatient Program.   (Stip. Facts ¶ 11; Pl.

Cert. ¶ 10; Jan. 16, 2019 email from Hankerson to Laura Kurtz, Pl. Ex. 2, at 2-4.)   Prior to this

time, there was no individual at Legacy who held the title of Director of the Northfield Office and,

instead, the office was being overseen by Redmond, the Division Director.   (Samantha Kunz

Dep., Def. Ex. F, at 28.)   Laura Kurtz, Legacy's onboarding coordinator, forwarded Hankerson's

application to Redmond, and noted, inter alia, that Hankerson had worked less than six months in

her existing position and that the Employee Handbook specified that "[t]o be considered for a

posted position, an interested employee . . . must . . . have been in his/her current position for at

least six months."[2]   (Jan. 19, 2019 email from Kurtz to Redmond, Pl. Ex. 2, at 2.)

A formal job posting for the Director position was issued on February 4, 2019.   (Job

Posting, Def. Ex. R.)   With respect to education and training, the job posting stated that Legacy

---

[2] Legacy's Employee Handbook states:
   To be considered for a posted position, an interested employee must (1) have been
   in his/her current position for at least six months, (2) have received no written
   discipline, active counseling reviews or pending Corrective Action Plans . . . ; (3)
   meet the posted job requirements for the open position, and (4) inform, in writing,
   the [HR] Department of his/her interest in the position.
(Legacy Employee Handbook, Pl. Ex. 9, at 44.)   The Handbook further states that "[h]iring from
within will be given priority whenever possible, thus providing for advancement and growth to
Legacy Treatment Services employees."   (Id.)

was seeking applicants with a "Master's Degree with clinical experience of at least five years post-masters," and also stated: "Clinical license required and ability to supervise license eligible or certified employees in mental health and drug and alcohol services."   (Id.)   According to Joseph Haber, Legacy's Vice President of Ambulatory and Emergency Services, who was involved in the hiring process, Hankerson did not have one of the two licenses that Legacy was really looking for—namely, the LCADC, which would permit the individual to oversee the drug and alcohol portion of the programs that Legacy offers—but he was still considering her for the position. (Joseph Haber Dep., Def. Ex. N., at 35-36, 81, 88; Haber Dep., Pl. Ex. 22, at 11.)   Haber stated at his deposition that, at the time of Hankerson's termination, he and Christine Kirkbride, the Chief Operating Officer ("COO") of Legacy, who was also involved in the hiring process, "hadn't made a determination whether or not she'd be a fit."   (Haber Dep., Def. Ex. N, at 88; Christine Kirkbride Dep., Pl. Ex. 21, at 22.)

On the same day that the job opening was posted, Redmond advised Hankerson that he was reviewing her earlier letter of interest for the position.   (Feb. 4, 2019 email from Redmond to Hankerson, Def. Ex. Q, at 1.)   Several weeks later, in March of 2019, Redmond resigned from his position at Legacy.   (Kunz Dep., Def. Ex. F, at 28.)   Samantha Kunz, who was one of Legacy's Division Directors of Ambulatory and Emergency Services, took on the role of Acting Director at the Northfield location while Legacy searched for a permanent Northfield Director.   (Id. at 21, 27-28; Legacy Organizational Chart, Def. Ex. J.)   Kunz was a licensed professional counselor. (Kunz Dep., Pl. Ex. 20, at 35; Stip. Facts ¶ 13.)

In March of 2019, while the hiring process for the Northfield Director was underway, Hankerson advised Kunz that she wanted to change Legacy's procedure of using of a symbolic

genogram during the new clinical patient intake process.[3]   (Hankerson Dep., Pl. Ex. 24, at 68-69; Kunz Dep., Pl. Ex. 20, at 101; Keri Basler Dep., Def. Ex. E, at 50 (stating that Legacy used symbolic genograms).)   Hankerson believed that use of the symbolic genogram was taking too much time, and she told Kunz that the genogram was "considered antiquated by most therapists." (Hankerson Dep., Pl. Ex. 24, at 68.)   Hankerson told Kunz in a March 18, 2019 email that she would be discussing the genograms with her supervisees the next day, in case Kunz wanted to sit in.   (March 18, 2019 email from Hankerson to Kunz, Pl. Ex. 11, at 2.)   She also sent out materials to the supervisees, telling them that she was going to teach them an alternative way of gathering the same type of information that the genogram was designed to gather.   (Hankerson Dep., Pl. Ex. 24, at 69.)   On March 19, 2019, Hankerson sent Kunz some information concerning a written genogram.   (March 19, 2019 email from Hankerson to Kunz, Pl. Ex. 18)

However, on March 20, 2019, after Hankerson had planned the training session, Kunz sent out an email to Hankerson and others, in which she stated that Legacy's Northfield location was not going to change its genogram procedures.   (Hankerson Dep., Pl. Ex. 24, at 69; March 20, 2019 email from Kunz, Pl. Ex. 12, at 1-2.)   Specifically, Kunz wrote: "I know there has been some discussion about what types of genograms we should be using.   I did check with the directors of the other outpatients as I believe we should all be on the same page.   We will continue using symbolic genograms moving forward."   (March 20, 2019 email from Kunz, Pl. Ex. 12, at 2.) Kunz made this determination after consulting with both Keri Basler, the Director at another Legacy location, and Sondra Dublinsky, another Outpatient Therapist at the Northfield location. (See Kunz emails with Dublinsky and Basler, Def. Exs. I & K; Kunz Dep., Pl. Ex. 20, at 45.)

---

[3] A "genogram" is a tool used to take note of an incoming patient's family history, and Legacy required a symbolic genograms to be conducted at intake.   (Basler Dep., Def. Ex. E, at 44, 49; Def. Ex. I.)

Dublinsky told Kunz that, as both an LCSW and an LCADC, she had been taught to use a symbolic genogram and that Legacy had also trained her to use symbolic genograms when she started her employment.   (March 19, 2019 email from Dublinsky to Kunz, Def. Ex. I, at 1.)

At 9:32 a.m., on March 21, 2019, Hankerson sent an email to Kunz, in which she stated that "following that Genogram decision," she could "no longer Supervise the Interns effective immediately."   (March 21, 2019 email from Hankerson to Kunz, Def. Ex. M, at 1.)   Hankerson explained:   "For any decision to be made that will affect how I supervise without consulting me is not only an affront to me but it does not allow me to perform the duties of the [supervisor] role responsibly."   (Id.; see also Hankerson Dep., Pl. Ex. 24, at 69 (testifying that Kunz's decision demonstrated that she "didn't have the proper authority to actually supervise [her] supervisees").) Hankerson did not receive a response to that email.   (Stip. Facts ¶ 8.)   At 1:18 p.m. that same day, Hankerson sent an email to Webster, stating:   "As of today, I will no longer be your Supervisor."   (March 21, 2019 email from Hankerson to Webster, Def. Ex. P.)   Two minutes later, Webster sent an email to Kunz and Haber, asking: "Due to supervisor requirements, does this mean that I cannot see clients?"   (March 21, 2019 email from Webster, Def. Ex. P.)

On Friday, March 22, 2019, at 3:47 p.m., Kunz sent an email to Hankerson, stating "I need to talk to you when you get in.   I canceled your 8:30 a.m."   (March 22, 2019 email from Kunz to Hankerson, Pl. Ex. 15.)   At the time that Kunz sent that email, Kunz, Haber, and Kirkbride had already made a joint decision that Hankerson's employment should be terminated.   (Kunz Dep., Def. Ex. F, at 115.)

A Counseling Review Process form dated March 25, 2019, recounts that a counseling review occurred on March 25 between Kunz and Hankerson "to discuss employee's decision, on 3/21, to stop providing clinical supervision to three staff without proper notification to

management."   (Counseling Review Process Form, Pl. Ex. 16.)   The form noted that apart from Hankerson's email to Kunz on March 21 at 9:32 a.m., "there had been no other discussion of [Hankerson's decision to terminate supervision] with management prior to her notifying her supervisee" and that Kunz "had not yet responded due to working on an immediate transition plan for these staff to receive supervision."   (Id.)   The form referred to the Best Practice Standards in Social Work Supervision, which state that one of two "germane areas of work [that] require attention" is "termination of the supervisory relationship."   (Id.)   In that regard, the form noted, the Best Practices Standards state that "[w]hen the supervisor is leaving, if appropriate, a smooth transition to a new supervisor should be arranged."   (Id.)   The form stated with regard to Hankerson that "[t]he lack of transition plan for the supervisees to another supervisor directly placed over 150 Legacy consumers at risk of treatment interruption due to their therapists being unable to practice causing great disruption to the ability of Legacy to provide appropriate care for their consumers."   (Id.)   It further stated that, "[d]ue to this egregious incident placing the agency at risk, employee will be terminated effective immediately."   (Id.)   Hankerson handwrote on the form: "Received by Disagree.   This administration has made it impossible for me to supervise."

(Id.)   She also provided the following explanation:

> As I have informed you on more th[an] one occasion.   There has been no communication about Supervision of the students w/ me and there have been decisions made by this organization that has made it IMPOSSIB[LE] for me to Supervise.

(Id. at 2.)

Hankerson's employment was terminated on March 25, 2019.   (Stip. Facts ¶ 9.) Hankerson's termination of employment letter stated that she was terminated for cause, citing Legacy's HR Policy.   (April 4, 2019 Termination Letter, Pl. Ex. 14.)

Following Hankerson's announcement that she would no longer supervise, effective

immediately, Legacy sought to identify an employee to take over her supervisory responsibilities. (Kunz Dep. Def. Ex. F, at 109-10.)   At the time, Legacy's clinical employees with supervisory credentials were already supervising the maximum number of individuals that they were permitted to supervise.   (Id. at 110.)   As a result, Kirkbride took over Hankerson's supervisory responsibilities.   (Kirkbride Dep., Def. Ex. D, at 119.)   According to Kunz, this was "far from ideal" because Kirkbride, as the COO, had a very busy schedule and did not typically spend time on clinical matters.   (Kunz Dep., Def. Ex. F, at 110-11.)   As Kirkbride herself testified, she was "[a]bsolutely not" prepared to step in to supervise as she had a full-time job as COO, no longer participated in clinical supervision, did not live close to the Northfield office, and "had to make . . . changes to her work schedule pretty quickly."   (Kirkbride Dep., Def. Ex. D, at 124.)

When Hankerson was terminated, Legacy had just recently begun interviewing applications to fill the open position of permanent Director of the Northfield Outpatient program, with the first interview occurring on March 19, 2019, and the permanent Director position remained vacant.   (Stip. Facts ¶¶ 10, 12; Legacy Affirm. Action Log Form, Def. Ex S.)   Legacy had enlisted the help of a recruiting agency called Xelerate to find outside candidates for the position.   (Haber Dep., Def. Ex. N, at 36.)   Legacy interviewed five candidates for the position, all of whom were white.   (Legacy Affirm. Action Log Form, Def. Ex S.)   It interviewed just two candidates before Hankerson was terminated: Kelly Geary on March 18, 2019, and Lauren Maguire on March 22, 2019.   (Id.)   It interviewed three candidates after Hankerson was terminated:   J.R. Griffin on April 5, 2019, Heather Reynolds on April 18, 2019, and Lauren Grassi on April 24, 2019.   (Id.)

In spite of the job posting stating that Legacy was seeking candidates with the "ability to supervise . . . employees in mental health and drug and alcohol services," not all of the interviewees

had an LCADC.   (Job Posting, Def. Ex. R.)   Maguire's application for employment indicated that she was an "ADC intern," which meant that she was working towards obtaining an LCADC. (Haber Dep., Def. Ex. N, at 205.)   On Grassi's candidate evaluation form, which was completed in conjunction with her interview, it was noted that Grassi, an LCSW, "does not have Supervisory Credential or LCADC," but would be "able to obtain both over the next 3 months."   (Grassi Eval. Form, Pl. Ex. 7; see also Haber Dep., Def. Ex. N, at 75, 78-79.)   Reynolds also did not have an LCADC.   (Haber Dep., Pl. Ex. 22, at 68.)   On June 13, 2019, Legacy hired Geary as its full-time Program Director for the Outpatient Northfield Program, with a projected start date of June 24, 2019.   (June 13, 2019 letter from Ehrhart to Geary, Def. Ex. U.)   Hankerson was never interviewed for the position.   (Pl. Cert. ¶ 12; Haber Dep., Def. Ex. N, at 88.)

Plaintiff's Amended Complaint contains eight Claims for Relief ("Counts"), which assert claims of race and age discrimination.   Counts I and II asserts that Legacy violated Title VII and the NJLAD by failing to promote Hankerson based on her race.   Counts III and IV assert that Legacy violated the ADEA and the NJLAD by failing to promote her due to her age.   Count V and VI assert that Legacy violated Title VII and the NJLAD by unlawfully terminating her employment based on her race.   Counts VII and VIII assert that Legacy violated the ADEA and the NJLAD by unlawfully terminating her based on her age.   Defendant seeks summary judgment in its favor on all eight Counts.

## II.   LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."   Anderson v. Liberty Lobby. Inc., 477 U.S. 242, 248 (1986).   A factual

dispute is "material" if it "might affect the outcome of the suit under the governing law."  Id.   In ruling on a summary judgment motion, we consider "the facts and draw all reasonable inferences in the light most favorable to . . . the party who oppose[s] summary judgment."  Lamont v. New Jersey, 637 F.3d 177, 179 n.1 (3d Cir. 2011) (citing Scott v. Harris, 550 U.S. 372, 378 (2007)).   If a reasonable fact finder could find in the nonmovant's favor, summary judgment may not be granted.  Congregation Kol Ami v. Abington Twp., 309 F.3d 120, 130 (3d Cir. 2002) (citation omitted).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).   Where the nonmoving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court" that "there is an absence of evidence to support the nonmoving party's case."  Id. at 325. After the moving party has met its initial burden, the adverse party's response "must support the assertion [that a fact is genuinely disputed] by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials [that the moving party has cited] do not establish the absence . . . of a genuine dispute."  Fed. R. Civ. P. 56(c)(1).   Summary judgment is appropriate if the nonmoving party fails to respond with a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.   "'While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla.'"  Galli v. New Jersey Meadowlands Comm'n, 490 F.3d 265, 270 (3d Cir. 2007) (quoting Hugh v. Butler Cnty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005)).

## III.    DISCUSSION

Hankerson brings her discrimination claims pursuant to Title VII, the ADEA, and the NJLAD.   Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."   42 U.S.C. § 2000e–2(a)(1).   Almost identically, the ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."   29 U.S.C. § 623(a)(1).   The NJLAD similarly makes it unlawful for any employer to discharge or otherwise discriminate against an employee based on that employee's race or age.   N.J. Stat. 10:5-12(a).   Hankerson asserts that Legacy discriminated against her based on her age and race both by failing to interview her for, and promote her to, Director and by terminating her employment.

"All . . . discrimination claims brought under Title VII and the NJLAD, including those based on . . . race . . . , which rely on circumstantial evidence, are controlled by the three-step burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973)."   Tourtellotte v. Eli Lilly & Co., 636 F. App'x 831, 841 (3d Cir. 2016) (citations omitted). ADEA age discrimination claims that rely on circumstantial evidence are also governed by that three-step framework.   See Burton v. Teleflex, Inc., 707 F.3d 417, 425-26 (3d Cir. 2013) (citing Smith v. City of Allentown, 589 F.3d 684, 691 (3d Cir. 2009)) (additional citation omitted).   Here, the parties agree that Plaintiff does not have direct evidence of discrimination and that her discrimination claim should therefore be analyzed pursuant to the burden shifting framework set forth in McDonnell Douglas.

"Under <u>McDonnell Douglas</u>, the plaintiff bears the initial burden of demonstrating a prima facie case of unlawful discrimination . . . ."  <u>Dellapenna v. Tredyffrin/Easttown Sch. Dist.</u>, 449 F. App'x 209, 213 (3d Cir. 2011) (citing <u>McDonnell Douglas</u>, 411 U.S. at 802).   In order to demonstrate a prima facie case of discrimination, a plaintiff must establish that "(1) s/he is a member of a protected class; (2) s/he was qualified for the position s/he sought to attain or retain; (3) s/he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination."  <u>Makky v. Chertoff</u>, 541 F.3d 205, 214 (3d Cir. 2008) (citations omitted).

Once a plaintiff establishes a prima facie case of discrimination, "'the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its decision.'"  <u>Dellapena</u>, 449 F. App'x at 213 (quoting <u>McDonnell Douglas</u>, 411 U.S. at 802)).   "This burden is 'relatively light,' and the employer need only 'introduc[e] evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision.'"  <u>Tomasso v. Boeing Co.</u>, 445 F.3d 702, 706 (3d Cir. 2006) (quoting <u>Fuentes v. Perskie</u>, 32 F.3d 759, 763 (3d Cir. 1994)).

The plaintiff then has the burden to show that the defendant's reason is pretextual by "'point[ing] to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'"  <u>Burton</u>, 707 F.3d at 427 (quoting <u>Fuentes</u>, 32 F.3d at 764).   "The ultimate burden of persuading the trier of fact that the defendant discriminated remains at all times with the plaintiff."  <u>Davis v. Cleary</u>, Civ. A. No. 09-0925, 2011 WL 4435697, at *3 (D.N.J. Sept. 22, 2011) (citing <u>Shaner v. Synthes</u>, 204 F.3d 494, 500–01 (3d Cir. 2000)).

Here, Legacy does not argue that Hankerson has failed to satisfy her burden to demonstrate a prima facie case of discrimination.   Rather, it argues only that it has satisfied its burden of articulating legitimate nondiscriminatory reasons both for terminating her and for failing to interview and promote her, and that Plaintiff cannot point to evidence from which a factfinder could reasonably conclude that Legacy's reasons are mere pretext.

A. Unlawful Termination

In her unlawful termination claims, Hankerson asserts that Legacy terminated her from her job as an outpatient therapist because of her race and age.   Legacy argues that it has met its burden under McDonnell-Douglas to articulate a legitimate, non-discriminatory reason for terminating Hankerson's employment because it has demonstrated that she unilaterally terminated her clinical supervision without a transition plan in place and abruptly told her supervisees that she was no longer supervising them without first discussing that decision with management.   It maintains that Hankerson's actions were undoubtedly legitimate reasons for termination not only because her actions were unprofessional but also because the undisputed record evidence reflects that, as a result of her actions, the LSWs under her clinical supervision were unexpectedly left without the ability to see patients and their patients were not able to receive treatment without the immediate appointment of another supervisor.

Hankerson does not dispute that Legacy has met its burden of articulating a non-discriminatory reason for her termination, but she argues that she has met her burden of pointing to evidence that supports a reasonable conclusion that the articulated reasons for her termination are pure pretext.   As noted above, to establish pretext, a plaintiff must "'point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason

was more likely than not a motivating or determinative cause of the employer's action.'" Burton 707 F.3d at 427 (quoting Fuentes, 32 F.3d at 764). Hankerson attempts to meet her burden of establishing pretext under both of these methods.

### 1. Discrediting of Legacy's Proffered Reason

In relying on this first method of establishing pretext, a plaintiff must cast sufficient doubt on the employer's reasoning "to satisfy the factfinder that the employer's actions could not have been for nondiscriminatory reasons." Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 644–45 (3d Cir. 2015) (citing Fuentes, 32 F.3d at 762). "[T]he plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Fuentes, 32 F.3d at 765 (citations omitted). "Rather, the . . . plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reason[] for its action that a reasonable factfinder *could* rationally find [it] 'unworthy of credence'" and infer that the employer did not act for that reason. Fuentes, 32 F.3d at 764 (quoting Ezold v. Wolf, Block, Schorr & Solis–Cohen, 983 F.2d 509, 531 (3d Cir. 1992)) (additional citations omitted). In other words, a plaintiff must show that the proffered reason "was so plainly wrong that it cannot have been the employer's real reason." Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1109 (3d Cir. 1997).

As noted above, Legacy states that it had reason to fire Hankerson because she terminated her clinical supervision duties without first discussing the termination with management and without a plan in place for transitioning the LSWs under her supervision to a new supervisor. Hankerson does not dispute that she emailed at least one supervisee that she was no longer supervising her before she had any discussion with management or formulated a transition plan.

She nevertheless argues that her actions in this regard were not a valid—or believable—reason to terminate her because Legacy immediately found someone else—namely, Kirkbride—to supervise the LSWs, which demonstrates that none of her supervisees' patients were actually at risk of having their services interrupted.   Moreover, Hankerson argues, it is not credible that Legacy actually cared about her supervisees' patients because its own actions in terminating her employment put the 50-60 patients that she was treating at risk for service interruption.[4]   She also contends that Legacy, not she, was at fault for the lack of a transition plan because it did not promptly reach out to her after she advised Kunz that she could "no longer Supervise the Interns effective immediately."  (March 21, 2019 email from Hankerson to Kunz, Def. Ex. M, at 1; Stip. Facts ¶ 8.)   In addition, she argues that the Best Practice Standard Handbook only states that a smooth transition should be arranged "if appropriate" and, in her case, it was not appropriate to arrange a transition because she simply could not continue to supervise responsibly given Kunz's interference in her decision-making.[5]   (Counseling Review Process Form, Pl. Ex. 16, at 1.)

---

[4]   Joseph Haber testified as follows with respect to the risks posed to Hankerson's patients as a result of her termination: "[A]t some point in time you have to weigh multiple concerns, and the violation was something that we couldn't keep [Hankerson] employed with us any further." (Haber Dep., Pl. Ex. 22, at 180.)

[5]   Hankerson also asserts that the decision to terminate her employment was inconsistent with Legacy's policy of progressive discipline and that this further supports a conclusion that Legacy's reasons for terminating her were implausible.   However, Legacy's Employee Handbook provides that "[t]here are several levels of discipline, including warnings (oral and written), probation, suspension, and termination.   The frequency and/or severity of the misconduct determine the appropriate level of discipline."  (Pl. Ex. 9 at 44.)   Accordingly, the policy does not mandate that every infraction must be handled with progressive discipline.   Rather, it allows Legacy to impose discipline that reflects the severity of the misconduct.   And while Haber testified that Legacy "believe[s] in progressive discipline usually," he also testified that type of discipline imposed is always dependent upon the severity of the misconduct.   (Haber Dep., Pl. Ex. 22, at 164.)   Thus, Hankerson has not pointed to evidence from which a jury could conclude that Legacy's failure to impose progressive discipline was inconsistent with the policy, and she cannot rely on such a purported inconsistency to support an inference that Legacy's reason for her termination was implausible.

However, Hankerson's focus on whether Legacy properly perceived, and was able to mitigate, the risks caused by her abrupt abdication of her supervisory responsibilities, and on whether Legacy could have or should have responded differently to her actions, is misplaced.   The factual question before us is not whether Legacy's decision to terminate Hankerson (instead of responding differently) was wise or wrong; it is simply whether Hankerson's actions were the reason that Legacy terminated her employment.   See Fuentes, 32 F.3d at 765.   Because Hankerson admits that she terminated her supervision "effective immediately" without any transition plan in place, and the record evidence is undisputed that, as a result of this conduct, Legacy had to quickly and unexpectedly find a new supervisor to take over her responsibilities, we find that no reasonable jury could conclude that Legacy's "reason for [termination] is so weak as to render it 'unworthy of credence.'"   Willis, 808 F.3d at 647-48 (quoting Fuentes, 32 F.3d at 765).   We therefore conclude that Hankerson has failed to meet her burden of pointing to evidence from which a jury could find pretext based on her discrediting of Legacy's proffered reason for termination.

### 2.   Proof that Invidious Discrimination was the Likely Reason

When attempting to show pretext by pointing to evidence that "an invidious discriminatory reason was 'more likely than not a motivating or determinative cause' of the employer's action," a plaintiff must present evidence "'with sufficient probative force' so as to allow the factfinder to 'conclude by a preponderance of the evidence that age [or race] was a motivating or determinative factor.'"   Willis, 808 F.3d at 645 (first quoting Fuentes, 32 F.3d at 764, and then quoting Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 644-45 (3d Cir. 1998)).   Among the evidence that a plaintiff can present to satisfy this "second way to prove pretext" is evidence that "(1) the defendant previously discriminated against the plaintiff; (2) the

defendant discriminated against others within the plaintiff's protected class; or (3) the defendant has treated similarly situated, substantially younger [or white] individuals more favorably."  Id. (citing Simpson, 142 F.3d at 645).

Hankerson argues that "[a] reasonable jury could infer that Legacy's response was so disproportional in light of its articulated concerns for its consumers that it could conclude that Legacy's actions were determined by racial or ageist animus."  (Pl. Mem. at 23.)   In support of this statement, Hankerson notes that that Legacy's human resource manager could not recall one time in fifteen years when an employee was immediately terminated because he or she "disagreed with Legacy's view of the standards of . . . professional responsibility for clinical supervision."[6] (Dana Carroll Dep., Pl.'s Ex. 23, at 79-80.)   However, the mere fact that Legacy may have imposed an unusually harsh punishment for Hankerson's misconduct does not give rise to an inference that it did so because of her race and age.   In the absence of some other evidence that could give rise to an inference that Legacy acted based on discriminatory animus—such as evidence that younger and/or white employees had engaged in conduct similar to Hankerson's and yet were not terminated, or evidence that Legacy had otherwise discriminated against older or African-American employees—no factfinder could reasonably conclude that Hankerson's termination was more likely than not the result of invidious race or age discrimination. Accordingly, we conclude that Hankerson has failed to meet her burden of establishing that a reasonable jury could find pretext based on evidence that Legacy was motivated by invidious

---

[6] Hankerson also appears to argue that she can establish pretext with evidence that Legacy previously discriminated against her, arguing that the decision to terminate her was "tainted by the discrimination Hankerson suffered in connection with Legacy's failure to interview her."  (Pl. Mem at 23.)   This argument is dependent on the viability of Hankerson's failure to interview and promote claim, which we address in the next section and find to fail on the merits.   Accordingly, we do not address this argument further here.

discrimination.

In sum, we conclude that Hankerson has failed to point to evidence from which a jury could reasonably conclude that Legacy's articulated non-discriminatory reason for terminating her employment was actually pretext for discrimination.   We therefore grant Legacy's Motion insofar as it seeks judgment in its favor on the four Counts of the Complaint asserting discrimination based on unlawful termination (Counts V, VI, VII, and VIII), and we enter judgment in Legacy's favor on those claims.

B.  Failure to Promote

In her failure to promote claims, Hankerson asserts that Legacy failed to grant her an interview for the open Director position—and to therefore promote her—because of her race and age.   Legacy argues that it has met its burden to articulate a legitimate non-discriminatory reason for failing to interview Hankerson prior to her termination on March 25, 2019 because she did not possess all of the licensures that Legacy sought for that position, namely, she did not possess an LCADC.[7]   (Stip. Facts ¶ 5.)   Legacy further argues that it has provided a legitimate non-discriminatory reason for its failure to interview her for, and promote her to, the Director position after March 25, 2019—namely, because it had already terminated her for cause.   Hankerson argues that a jury could find that these reasons are pretexual based either on evidence that Legacy's

---

[7] Legacy argues secondarily that, as an internal candidate, Hankerson was not qualified for the Director position because she had not worked at Legacy for at least six months.   (See Legacy Employee Handbook, Pl. Ex. 9, at 44 (stating that "[t]o be considered for a posted position, an interested employee must (1) have been in his/her current position for at least six months").   Hankerson does not respond to this argument.   Accordingly, even assuming *arguendo* that Hankerson were able to discredit Legacy's explanation that her lack of an LDADC was the reason that Legacy did not interview or promote her prior to her termination, we would find that she has failed to meet her burden of pointing to evidence from which a jury could find "unworthy of credence" that her short tenure at the company was an alternative, legitimate, non-discriminatory reason that she did not receive one of the first interviews for the Director position.   Willis, 808 F.3d at 648 (quoting Fuentes, 32 F.3d at 765).

articulated reason is incredible or on evidence that invidious discrimination was more likely than not the reason for Legacy's actions.

1. Discrediting of Legacy's Proffered Reason

Hankerson primarily argues that she has met her burden of pointing to evidence that supports a finding of pretext by identifying evidence from which a factfinder could disbelieve Legacy's articulated reasons for failing to interview and promote her.  Specifically, she asserts that there is evidence from which a jury could find it implausible that Legacy did not interview her prior to her termination because she did not have an LCADC.[8]   She points to (1) the job posting, which, on its face, did not require an LCADC; (2) evidence that one of the two individuals that Legacy interviewed prior to March 25, 2019 did not hold an LCADC (Maguire); (3) evidence that two of the applicants that Legacy interviewed after March 25, 2019 also did not possess such licensure (Reynolds and Grassi); and (4) Haber's testimony that Legacy was considering Hankerson for the position in spite of her lack of an LCADC.   Based on this evidence, Hankerson maintains that a jury could reasonably find that an LCADC was not a requirement for the Director position and that Legacy's explanation that it did not interview and promote her prior to her termination because she did not hold an LCADC is therefore implausible.

However, Hankerson's focus on whether the possession of an LCADC was an inflexible requirement for the Director position is misguided, as there is no genuine dispute that Legacy

---

[8] It is worth emphasizing that the only two interviews that Legacy conducted before Hankerson was terminated were on March 19, 2021, two days before Hankerson announced that she would no longer supervise, and March 22, 2021, the same day that Legacy made a decision to terminate her.  Moreover, the interview process was ongoing at the time of Hankerson's termination, and no reasonable jury could conclude that Legacy's failure to interview Hankerson after it legitimately terminated her was discriminatory.  Accordingly, Hankerson's claim that Legacy discriminated against her by failing to interview her is necessarily dependent on a presumption that Legacy had an obligation to interview her first, before it interviewed other candidates.

sought and preferred candidates with such licensure.  The undisputed evidence is that the job posting for the Director position specified that Legacy was seeking candidates with the "ability to supervise license eligible or certified employees in mental health and drug and alcohol services." (Job Posting, Def. Ex. R.)   Haber explained at his deposition that the reason that Legacy sought someone with the ability to supervise drug and alcohol services was that "Northfield is dually licensed as both a mental health outpatient facility [and] a drug and alcohol facility" and an LCADC was therefore "vital" in order for the Director "to oversee the drug and alcohol portion of the program or sites."  (Haber Dep., Def. Ex. N, at 35.)  Hankerson admits that she did not hold an LCADC, and there is no dispute that the only two applicants that Legacy interviewed for the Director position before Hankerson was fired either had an LCADC (Geary) or were actively pursuing one (Maguire).  Moreover, the evidence is that the candidate that Legacy ultimately hired (Geary) had both an LCADC and an LCSW and, thus, could oversee all of Legacy's programs, including those involving drug and alcohol.

Hankerson nevertheless maintains that a jury could reasonably infer that Legacy's explanation that it did not interview her prior to her termination because she did not hold an LCADC was pretextual because one of the two candidates it interviewed in that time frame did not yet have an LCADC but, instead, was an "LCADC intern."   However, there can be no question that Legacy's decision to interview that candidate (Maguire) was fully consistent with its stated preference for candidates who would be able to supervise drug and alcohol services as the undisputed evidence is that Maguire was actively pursuing her LCADC.  Moreover, Haber testified that he and Kirkbride had not ruled out Hankerson as a candidate, but "because [they] were . . . using Xelerate, [they] wanted to see what other candidates were brought in that potentially had all of the certifications needed to oversee that position."   (Haber Dep., Def. Ex. N, at 57.)   In

response to Legacy's explanation in this regard, Hankerson has submitted a certification, in which she attempts to discredit Legacy's justification for interviewing Maguire by stating that "it . . . would have been a relatively simple matter for me to obtain an LCADC" and "it would likely take [her] only a few months to obtain an LCADC."  (Pl. Cert. ¶¶ 13-14.)  However, Maguire's job application had indicated that she was an ADC intern.   (Maguire Job Application, Def. Ex. T, at 1.)   In contrast, Hankerson has put forth no evidence that she communicated to Legacy that she was in the process of obtaining an LCADC or was willing to take the steps necessary to obtain that certification.   Under these circumstances, the fact that "it would have been a relatively simple matter for [her] to obtain an LCADC" within a few months in no way discredits Legacy's explanation that it did not initially interview her for the position because she did not possess that certification, which would have given her the ability to oversee Legacy's drug and alcohol services. (Pl. Cert. ¶¶ 13-14.)

Hankerson's assertion that a jury could reasonably disbelieve Legacy's explanation because it interviewed individuals without LCADCs for the Director position after her termination is also unpersuasive.   No reasonable jury could find implausible Legacy's explanation that it did not interview Hankerson for a promotion after her employment ended because she had been terminated for cause.[9]   Moreover, the fact that Legacy interviewed additional candidates who did not have LCADCs later in its interview process, after it had terminated Hankerson, in no way discredits its explanation that, early in the interview process, prior to Hankerson's termination, it prioritized individuals who would be able to supervise drug and alcohol services as was specified

---

[9]  Indeed, Hankerson does not attempt to discredit Legacy's stated reason for not interviewing her after she was terminated.   She merely argues that Legacy's conduct after her termination raises questions at to whether its reasons for failing to interview her prior to her termination were credible.

in the job posting.   Certainly, the proffered evidence concerning candidates that Legacy interviewed (but did not hire) subsequent to Hankerson's termination cannot support a reasonable conclusion that Legacy's explanation as to why it did not interview her prior to her termination is so "unworthy of credence" that discriminatory animus must have motivated Legacy's actions. Willis, 808 F.3d at 648 (quoting Fuentes, 32 F.3d at 765).

Hankerson also argues that a jury could find that Legacy's reason for not interviewing her prior to her termination was incredible because Legacy has a policy of giving existing employees the first opportunity to apply for open positions and none of the candidates interviewed before her were internal candidates.   (Legacy Employee Handbook, Pl. Ex. 9, at 10 ("Job openings at Legacy . . . will be posted Agency-wide for review by all employees to give them the opportunity to apply for open positions that occur within Legacy."); Dana Carroll Dep., Pl. Ex. 23, at 51 (testifying that jobs are "posted internally first" and sometimes "externally simultaneously" in order "[t]o give all current employees an opportunity . . . [t]o review [the job] for consideration").)   As we understand this argument, Hankerson reasons that because she was an internal candidate, Legacy was required under its policy to interview her first, irrespective of any other considerations of her qualifications for the position.   However, contrary to Hankerson's apparent understanding, the policy, on its face, does not require Legacy to interview internal candidates before external candidates; rather, it merely provides that internal employees will be given an early opportunity to submit applications for an open position.   (Legacy Employee Handbook, Pl. Ex. 9, at 10.)   Here, Hankerson was given that opportunity as she was permitted to apply in January 2019, before the official job posting was even issued on February 4.   (See Stip. Facts ¶ 11; Job Posting, Def. Ex. R).   Thus, there can be no dispute that Legacy did not violate its own written policy.   Accordingly, no jury could reasonably discredit Legacy's explanation that it did not interview Hankerson because she did not

hold an LCACD based on a conclusion that Legacy did not follow its own policies with respect to internal and external candidates.

Under all of these circumstances, we find that Hankerson has failed to point to evidence that could support a reasonable conclusion that Legacy did not actually have a stated preference for candidates with the ability to supervise drug and alcohol services and/or did not act in accordance with that preference when it identified the first candidates to interview.   Thus, we find that Hankerson has failed to point to evidence from which a jury could reasonably conclude that Legacy's explanation that it did not interview Hankerson prior to her termination because she did not hold an LCADC "is so weak as to render it 'unworthy of credence.'"   Willis, 808 F.3d at 648 (quoting Fuentes, 32 F.3d at 765).   We therefore reject Hankerson's argument that she has supported her claim of pretext by identifying evidence that shows "'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions'" in Legacy's explanations for its failure to interview or promote her, such that a reasonable jury could rationally infer that Legacy did not act for its asserted non-discriminatory reason.   Fuentes, 32 F.3d at 764.

### 2.   Proof that Invidious Discrimination was the Likely Reason

Hankerson also suggests that the evidence supports a reasonable conclusion that Legacy's reasons for failing to interview and promote her are pretextual because a reasonable factfinder could "believe that an invidious discriminatory reason was 'more likely than not a motivating or determinative cause' of [Legacy's] action."   Willis, 808 F.3d at 645 (quoting Fuentes, 32 F.3d at 764).   In this regard, she contends that Legacy "treated "similarly situated, substantially younger [and white] applicants more favorably."   Id. (citing Simpson, 142 F.3d at 645).   Specifically, she asserts that the undisputed evidence is that Legacy interviewed five white, younger candidates for

the Director position,[10] and she maintains that this approach was flatly inconsistent with Legacy's own affirmative action policy, which states that "Legacy . . . strives to provide culturally competent services and to hire and promote employees that are representative of the population it serves," i.e., a population that is "made up of all different races and cultures." (Legacy Employee Handbook, Pl. Ex. 9, at 10; Dana Carroll Dep., Pl. Ex. 23, at 50.)

On the existing record, however, no reasonable jury could conclude that the five candidates that Legacy interviewed were similarly situated to Hankerson such that it could draw a reasonable inference that Legacy's decision to interview them was based on their race.   First, there can be no factual dispute that the three candidate who were interviewed after Hankerson was fired were not similarly situated to Hankerson because, unlike Hankerson, they had not already been fired by Legacy for misconduct.   Second, the candidate that Legacy ultimately hired, Geary, was not similarly situated to Hankerson because she held an LCADC, a clinical license that the undisputed evidence shows Legacy desired and Haber testified was "vital" to a candidate's ability to fully perform the Director's job.   (See Job posting, Def. Ex. R; Haber Dep., Def. Ex. N, at 35.)   And while the fifth candidate (Maguire) was interviewed in spite of her lack of an LCADC, there is no dispute that Maguire was actively working on obtaining that certification, which distinguishes her situation from that of Hankerson. (Haber Dep., Def. Ex. N., at 205.)   Moreover, as we have previously noted, Maguire was interviewed the day after Hankerson sent her email to Kunz stating that she was terminating her supervision effective immediately and the same day that Legacy made

---

[10] Although Hankerson asserts that the five candidates whom Legacy interviewed for the Director position were younger than she, she points to no evidence in the record that supports this assertion.   Moreover, we could find no evidence in the record that reflects the ages of the five interviewed candidates.   Legacy does not argue, however, that the record cannot support a conclusion that the individuals interviewed for the Director position were younger than Hankerson and, thus, for purposes of resolving Legacy's Motion, we accept as a fact that the five candidates were younger than Hankerson.

a determination to terminate Hankerson for cause.   Thus, Maguire's situation is further distinguishable from Hankerson's in that she, unlike Hankerson, was not actively engaged in a dispute with Legacy.

Under these circumstances, there is simply no basis on which a reasonable jury could conclude that it was more likely than not that Legacy did not interview and promote Hankerson because she was older and African-American, rather than because she did not hold an LCADC and then was terminated for cause for unrelated reasons while the interview process was ongoing.   We therefore reject Hankerson's argument that a reasonable jury could find based on evidence of past discriminatory conduct that Legacy's reason for its decision was pretext.

In sum, we conclude that Hankerson has failed to point to evidence from which a jury could reasonably conclude that Legacy's articulated non-discriminatory reasons for failing to interview her for, or promote her to, the Director position was actually pretext for discrimination.   We therefore grant Legacy's Motion insofar as it seeks judgment in Legacy's favor on the four Counts of the Complaint asserting discrimination based on failure to promote (Counts I, II, III, IV), and we enter judgment in Legacy's favor on those claims.

## IV.   CONCLUSION

For the foregoing reasons, we grant Legacy's Motion for Summary Judgment in its entirety and enter judgment in favor of Legacy and against Hankerson.   An appropriate Order follows.

BY THE COURT:

/s/ John R. Padova, J.

_____

John R. Padova, J.